**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**CASE No.:**

SHAWN CONBOY,

                Plaintiff,

vs.

SETH PERRIN, in his Individual Capacity;
RONALD CERCY, in his Individual Capacity;
ROBERT STEPHAN, in his Individual Capacity; and
PALM BEACH COUNTY SHERIFF'S OFFICE
[Ric L. Bradshaw, in his capacity as Sheriff
of Palm Beach County, Florida],

                Defendants.

_____/

## PLAINTIFF'S COMPLAINT

COMES NOW Plaintiff, SHAWN CONBOY (hereinafter "CONBOY"), by and through the undersigned attorneys, and hereby files this Complaint against SETH PERRIN (hereinafter "PERRIN"), in his Individual Capacity, RONALD CERCY (hereinafter "CERCY"), in his Individual Capacity, and ROBERT STEPHAN (hereinafter "STEPHAN"), in his Individual Capacity, for acts that occurred during the course and scope of their employment with Defendant, the PALM BEACH COUNTY SHERIFF'S OFFICE [Ric L. Bradshaw, in his capacity as Sheriff of Palm Beach County, Florida] (hereinafter "PBSO").

## INTRODUCTION

This civil action arises from an incident that occurred in the early morning hours of September 29, 2013, during the wrongful arrest of Plaintiff CONBOY after he willingly remained on the scene of a traffic fatality as an eyewitness. Defendants PERRIN, CERCY, and STEPHAN used unreasonable and excessive force against Plaintiff CONBOY when they

forcibly pushed him down to the pavement, struck his face against the hood of his car, used their Taser gun twice against him when he was already bleeding from his face and laying on the pavement, and forcibly put him in handcuffs when he was already under the physical control of the Defendants.

Plaintiff CONBOY brings federal constitutional claims against Defendant PERRIN, in his individual capacity, Defendant CERCY, in his individual capacity, and Defendant STEPHAN, in his individual capacity, for committing acts under color of law that deprived Plaintiff of his rights under the Constitution and the laws of the State of Florida by using excessive and unreasonable force against the Plaintiff during his wrongful arrest and handcuffing.   Further, Plaintiff brings federal constitutional claims against PBSO as the supervisory entity responsible for the conduct, training, and supervision of the Sheriff's Deputies under its charge.   PBSO failed to properly train Sheriff's Deputies in the appropriate methods, proper procedures, and protocols with respect to the use of force when conducting an arrest. PBSO had a policy and custom that constituted deliberate indifference to the Plaintiff's constitutional rights, and PBSO's policy and custom deprived the Plaintiff of his rights under the Constitution and the laws of the State of Florida, resulting in the use of excessive and unreasonable force during the Plaintiff's wrongful arrest and handcuffing.   Lastly, Plaintiff brings a negligent retention claim against PBSO for retaining Defendants PERRIN, CERCY, and STEPHAN, despite their history of internal affairs complaints.

## JURISDICTION AND VENUE

1.      Plaintiff in this action seeks relief under the Fourth and Fourteenth Amendments of the United States Constitution, and the Civil Rights Act of 1871, 42 U.S.C. § 1983, including

compensatory damages, punitive damages, costs, and attorney's fees, pursuant to 42 U.S.C. § 1988 and the Americans with Disability Act ("ADA") pursuant to 28 U.S.C. § 1331.

2.       Venue is proper in the Southern District Court of Florida, pursuant to 28 U.S.C. § 1391(b), as all Defendants work and/or reside in this District, and all of the acts and omissions giving rise to this action occurred in Palm Beach County.

3.       The Court has federal question jurisdiction over Plaintiff's federal law claims, pursuant to 28 U.S.C. §§ 1331, 1343(a)(3).   Plaintiff's state law claims are related to these federal claims and form a part of the same case or controversy. The Court accordingly has supplemental jurisdiction over Plaintiff's state law claims, pursuant to 28 U.S.C. § 1367(a).

4.       All conditions precedent to the maintenance of this action, including those set forth in Florida Statute § 768.28, have been performed, have occurred prior to its institution, or have been waived.

## **PARTIES**

5.       At all times material hereto, Plaintiff CONBOY was a resident of Broward County, Florida, and is otherwise sui juris.  CONBOY is a 56 year-old male, who graduated from the FBI National Academy and worked as a U.S. Marshal for thirty years before serving as an Area Security Manager for Florida Power and Light Company.   At the time of this incident, Plaintiff was a retired U.S. Marshal and possessed a valid permit to carry a concealed weapon. As a result of this incident, Plaintiff was unfairly terminated from his job with Florida Power and Light Company.

6.       At all times material hereto, Defendant PERRIN was employed as a Certified Sworn Law Enforcement Officer for the Defendant PBSO and was acting under the direction and control of PBSO, in such capacity as an agent, servant, and employee of PBSO.   Upon

3

information and belief, and at all times material hereto, Defendant PERRIN participated in the unconstitutional violations and other wrongful acts that occurred in the early morning hours of September 29, 2013, at which time he was acting within the course and scope of his employment under color of state law.  PERRIN is and was a resident of the State of the Florida and is otherwise sui juris.

7.     At all times material hereto, Defendant CERCY was employed as a Certified Sworn Law Enforcement Officer for the Defendant PBSO and was acting under the direction and control of PBSO, in such capacity as an agent, servant, and employee of PBSO.   Upon information and belief, and at all times material hereto, Defendant CERCY participated in the unconstitutional violations and other wrongful acts that occurred in the early morning hours of September 29, 2013, at which time he was acting within the course and scope of his employment under color of state law.  CERCY is and was a resident of the State of the Florida and is otherwise sui juris.

8.     At all times material hereto, Defendant STEPHAN was employed as a Certified Sworn Law Enforcement Officer for the Defendant PBSO and was acting under the direction and control of PBSO, in such capacity as an agent, servant, and employee of PBSO.   Upon information and belief, and at all times material hereto, Defendant STEPHAN participated in the unconstitutional violations and other wrongful acts that occurred in the early morning hours of September 29, 2013, at which time he was acting within the course and scope of his employment under color of state law.  STEPHAN is and was a resident of the State of the Florida and is otherwise sui juris.

9.     At all times material hereto, Defendant PBSO [Ric L. Bradshaw, in his capacity as Sheriff of Palm Beach County, Florida] is an entity, corporate and political, duly organized

under the laws of the State of Florida.  PBSO is the governmental entity responsible, as a matter of law, for the actions of its officials, agents, and employees, and was responsible for their training, supervision, and conduct.  PBSO is also responsible for ensuring that its police personnel obey the laws of the State of Florida and ensuring that its rules and regulations are followed and enforced.

10.     Plaintiff CONBOY sues Defendant PERRIN in his individual capacity.

11.     Plaintiff CONBOY sues Defendant CERCY in his individual capacity.

12.     Plaintiff CONBOY sues Defendant STEPHAN in his individual capacity.

## FACTUAL ALLEGATIONS

*Events That Occurred on September 29, 2013*

13.     In the late hours of September 28, 2013, and continuing into the early morning hours of September 29, 2013, Defendants PERRIN, CERCY, and STEPHAN, during the course and scope of their employment with PBSO, responded to various 911 calls reporting a serious car accident that resulted in a fatality at the intersection of Palmetto Park Road and Toledo Road in Boca Raton, Florida.

14.     At around 11:00pm on September 28, 2013, CONBOY and his then-girlfriend Natalie Damato were driving home from dinner at a local steakhouse when they witnessed this serious car accident at the intersection of Palmetto Park Road and Toledo Road.  CONBOY was one of the first individuals to attempt to help the injured accident victims, while Ms. Damato was one of the first individuals to contact 911 for help.

15.     Once PBSO arrived on scene, Defendant STEPHAN requested that CONBOY and Ms. Damato remain on-scene so they could proffer statements of what they witnessed.

Defendant STEPHAN asked for CONBOY and Ms. Damato's driver licenses for identification purposes, and they voluntarily and fully complied.

16.     After willingly waiting around for over an hour, both CONBOY and Ms. Damato became frustrated that no one had approached them to take their statements and that no one had returned their driver licenses.   CONBOY and Ms. Damato then requested that Defendant STEPHAN return their driver licenses so that they could leave the scene and go home.  They were both willing to give witness statements the following day.  Defendant PERRIN refused to return CONBOY and Ms. Damato's driver licenses; therefore, they were not free to leave the scene.

17.     In what felt like a trick to keep CONBOY at the scene, Defendant STEPHAN asked that CONBOY walk to the side of the road near his car to allegedly give his witness statement.  Defendant PERRIN and Defendant CERCY saw the men walking away from the crashed vehicles and toward CONBOY's parked car, and they followed behind them.

18.     What is more, another PBSO investigator, who was later identified as Stephen Lapinski, asked that Ms. Damato walk with him and away from CONBOY so that she could also allegedly give her witness statement.   Ms. Damato complied until she heard CONBOY screaming for help and exclaiming that Defendants STEPHAN, PERRIN, and CERCY were treating him like a criminal and not like an eyewitness.

19.     Ms. Damato walked over to where CONBOY and the Defendants were standing. She yelled to the Defendants that they leave both CONBOY and herself alone and allow them to go home.  Defendant PERRIN screamed in reply, "Shut the fuck up bitch!" to Ms. Damato and continued with insults and derogatory terms.

20.     CONBOY became upset when he saw the Defendants' negative treatment of Ms. Damato, and he crossed his arms and clenched his fists.

21.     With no further action or movement by CONBOY, Defendants STEPHAN, CERCY, and PERRIN lunged toward CONBOY and grabbed him by one arm.  The Defendants attempted to push him down to the ground, but they were unable to do so.  Instead, they struck CONBOY's face against the hood of his car.  Because of this impact, CONBOY lost control over his body.

22.     As his body was rolling down the side of his car following the impact suffered to his face, Defendant PERRIN deployed his dart-firing stun gun and struck CONBOY in the lower middle area of his back.  The electrical shock caused CONBOY's body to shake all over, and he ultimately landed on the pavement near the raised concrete median.

23.     Notwithstanding the abuse that had already taken place, and having already inflicted so much pain that CONBOY was lying on the pavement bleeding from his face, Defendant PERRIN deployed a second drive stun this time to the middle of CONBOY's back.  Defendants PERRIN, CERCY, and STEPHAN then placed CONBOY into handcuffs.

24.     Following the use of a Taser not once but twice, CONBOY was in such a terrible medical state that deputies contacted Palm Beach County Fire Rescue's Emergency Medical Services.  According to the EMS Report, CONBOY was treated on-scene for injuries on his nose and mouth.  Medical responders noted two sets of taser marks on CONBOY's back.  He was transported via ambulance to West Boca Medical Center for further treatment.

25.     PBSO charged the Plaintiff with one count of Battery on a Law Enforcement Officer, one count of Resisting Officer with Violence, one count of Attempting to Deprive Officer of Protection or Communication, one count of Corruption by Threat Against a Public

Official, and one count of Disorderly Intoxication.  These charges were "no-filed" by the State Attorney's Office.

26.     Following this incident and as a result of the charges brought against Plaintiff, CONBOY was terminated from his employment as an Area Security Manager for Florida Power and Light Company.  He lost his only source of income, and it was difficult for him to find another job even after the charges were "no-filed" by the State Attorney's Office.

27.     The police reports prepared by Defendants PERRIN and STEPHAN for submission to prosecuting authorities contained false statements and/or material omissions, and these police reports included a fabricated chain of events that was the result of collusion between the officers involved.

28.     The conduct of Defendants PERRIN, CERCY, and STEPHAN occurred under the color of State Law.

29.     Due to all three Defendants' lack of fear that any of their colleagues would find their actions improper and report them for improper conduct and the lack of discipline or consequences toward those who wantonly violated Plaintiff's rights, it is clear that the actions of Defendants PERRIN, CERCY, and STEPHAN reflect a custom, policy, and practice of Defendant PBSO.

30.     Taking Plaintiff's allegations as true, since none of the officers reported anything improper or unusual to their superiors, it is clear that all of the officers on the scene consider violation of rights and inflicting violence upon non-threatening and eyewitnesses they arrest or that are involved in an arrest to be standard procedure and consistent with the policy, custom, practice, and training of PBSO.

31.     PBSO's Internal Affairs investigation into the incident found no wrongdoing and thus condoned all actions taken by their officers upon Plaintiff.

32.     CONBOY's civil rights pursuant to the Fourth Amendment were violated with the use of excessive force by Defendants PERRIN, CERCY, and STEPHAN, when CONBOY was forcibly pushed down to the pavement, his face struck against the hood of his car, Tased twice when he was already bleeding from his face and laying on the pavement, and forcibly put in handcuffs when he was already under the physical control of the Defendants.

33.     Defendant PBSO knew or should have known the dangerous propensities of Defendants PERRIN, CERCY, and STEPHAN to engage in unlawful conduct, including the use of excessive force, in their employment as officers for PBSO, based on their prior unlawful conduct.

*Common Practice for PBSO*

34.     On a daily basis, Deputy Sheriffs come into contact with non-threatening eyewitnesses during their patrolling duties.  Despite this daily contact, Defendant PBSO made no effort to adequately train and supervise said deputies.  In order to adequately deal with the certainty of police contact with non-threatening eyewitnesses, PBSO is charged with supplying the public with a police force that is adequately trained and equipped to handle calls dealing with those who are non-threatening.

35.     PBSO was aware that there needed to be effective supervision and a command structure in place to deal with the problem of responding to incidents with non-threatening eyewitnesses.  PBSO failed to provide adequate supervision of its deputies in the field when said deputies encounter those who are non-threatening.

36.     At all times material hereto, PBSO was responsible for adopting and implementing the rules and regulations specifically in relation to hiring, screening, training, supervising, controlling, disciplining, and assigning deputies to their respective duties within Palm Beach County, Florida.

37.     PBSO has maintained a custom of excessive force in executing arrests by its sworn law enforcement officers.  At all times material hereto, under PBSO General Order 500.01 for Use of Non-Deadly/Less Lethal Force, officers may use only the amount of force reasonably necessary to affect lawful objectives and can only escalate to the next level of force that is justified considering the amount of resistance given and the potential of injury of the subject by using that type of control.

38.     PBSO's actions in this case and previous similar situations indicate a policy and custom of indifference to the rights of those they arrest who are non-threatening and a failure to properly train and/or supervise their officers in how to deal with non-threatening eyewitnesses being arrested.  PBSO's refusal to adequately train its deputies on how to interact with non-threatening eyewitnesses—and PBSO's failure to supervise those deputies—has resulted in the infliction of excessive violence upon non-threatening eyewitnesses and the violation of their constitutional rights.  This lack of training and supervision causes these ill-trained and ill-equipped deputies to resort to the use of excessive force as their only alternative.

39.     PBSO deputies have increasingly and alarmingly used deadly and excessive force in situations where the use of such force was entirely unjustified and where the conduct of the officers created dangers that would otherwise have not existed and contributed to the claimed need to use force.  There has specifically been an increasing and alarming number of similar incidents where PBSO deputies have falsely arrested members of the public and/or seriously

injured or endangered the public by the intentional and/or negligent misconduct by PBSO deputies. A review of the Internal Affairs Investigations of these incidents shows a conscious disregard to the facts and circumstances surrounding each incident and a blanket justification of the actions of the deputies involved.

40.     Further, there has been a pattern of similar incidents in which citizens were falsely arrested, injured, or endangered by the intentional and/or negligent misconduct of PBSO officers, revealing serious incompetence or misbehavior that is general or widespread throughout the department.

41.     Examples of the above referenced pattern of similar incidents that occurred prior to the incident alleged in this Complaint are as follow:

a.     On or about April 22, 2007, in West Palm Beach, Florida, PBSO deputies utilized excessive force against a detainee. The deputies failed to report said use of excessive force. PBSO took no disciplinary action against these deputies who inflicted this excessive force, and PBSO failed to properly investigate his actions due to the custom, practice, and policy of using unnecessary excessive force during arrests.

b.     On or about March 23, 2008, in Lake Worth, Florida, a PBSO deputy unnecessarily utilized his Taser on a handcuffed and compliant man following a routine traffic stop. PBSO took no disciplinary action against this deputy who excessively deployed his Taser, and PBSO failed to properly investigate his actions due to the custom, practice, and policy of using unnecessary excessive force during arrests.

c.     On or about July 15, 2008, in West Palm Beach, Florida, a PBSO deputy utilized his Taser excessively during an arrest of an individual. PBSO took no disciplinary action against this deputy who inflicted this excessive tasing, and PBSO failed to properly

investigate his actions due to the custom, practice, and policy of using unnecessary excessive force during arrests.

       d.     On or about August 6, 2008, in Royal Palm Beach, Florida, PBSO deputies followed a car into a movie theater parking lot at night. After the car appeared to accidentally bump into the police vehicle, causing no damage, a PBSO deputy shot and killed the sixteen year-old driver. The PBSO deputy later claimed to be fearful that the boy was trying to run him over. PBSO took no disciplinary action against these deputies who inflicted this deadly and excessive force and failed to properly investigate their actions due to the custom, practice, and policy of using unnecessary excessive force during arrests.

       e.     On or about April 28, 2011, in West Palm Beach, Florida, a PBSO deputy failed to utilize soft control techniques and deployed his Taser improperly while confronting an individual. PBSO took no disciplinary action against this officer who inflicted this excessive force and failed to properly investigate his actions due to the custom, practice, and policy of using unnecessary excessive force during arrests.

       f.     On or about February 9, 2013, in Palm Beach County, Florida, PBSO deputies used their drive stun weapons to gain control and arrest an individual. They also violently held on to the individual's legs. The individual required emergency medical attention at Wellington Regional Hospital. PBSO took no disciplinary action against these deputies who inflicted this excessive force and failed to properly investigate their actions due to the custom, practice, and policy of using unnecessary excessive force during arrests.

       g.     On or about February 12, 2013, in Palm Beach County, Florida, PBSO deputies arrived to the scene of a possible burglary. They manhandled and injured the wrists of a person in the front yard of the property only to later learn that he was the property owner. PBSO

took no disciplinary action against these deputies who inflicted this excessive force and failed to properly investigate their actions due to the custom, practice, and policy of using unnecessary excessive force during arrests.

        h.    On or about March 3, 2013, in Palm Beach County, Florida, PBSO deputies were escorting an arrested and handcuffed person out of the hospital when they slammed him against the cop car, causing the arrestee to sustain a small laceration.  PBSO took no disciplinary action against these deputies who inflicted this excessive force and failed to properly investigate their actions due to the custom, practice, and policy of using unnecessary excessive force during arrests.

        i.    On or about March 9, 2013, in Palm Beach County, Florida, PBSO deputies punched an individual in the forehead during an arrest.  PBSO took no disciplinary action against these deputies who inflicted this excessive force and failed to properly investigate their actions due to the custom, practice, and policy of using unnecessary excessive force during arrests.

        j.    On or about May 26, 2013, in Palm Beach County, Florida, PBSO deputies struck an individual in the face with a closed fist during an arrest.  The individual fell to the ground as a result of the blunt attack.  PBSO took no disciplinary action against these deputies who inflicted this excessive force and failed to properly investigate their actions due to the custom, practice, and policy of using unnecessary excessive force during arrests.

    42.    Further evidencing a pattern of similar incidents and Defendant PBSO's awareness that its deputies are repeatedly being accused of violating constitutional rights for conduct similar to what occurred in the incident described above, examples of similar incidents

that occurred prior to the incident alleged in this Complaint that also resulted in federal lawsuits alleging constitutional violations are as follows:

      a.     On or about December 25, 2008, in Belle Glade, Florida, a woman was pulled over by PBSO deputies for a simple traffic infraction. Without justification or reason, a PBSO deputy ordered this woman out of her car, placed her in a chokehold position, slammed her body to the ground, and handcuffed her. The deputy then dragged the woman to a patrol car, forced her into the back seat, and repeatedly punched her in the face while she remained handcuffed. Contrary to all evidence on scene, the deputy reported that the woman violently resisted arrest and charged the woman with Resisting Officer with Violence, Corruption by Threat to a Public Servant, and Aggravated Assault. All of these charges were ultimately dropped by the State of Florida. Despite evidence supporting the unconstitutional excessive force of the deputies involved and the false arrest of the woman, PBSO took no disciplinary action against the deputy who inflicted this excessive force and caused this false arrest and failed to properly investigate his actions due to the custom, practice, and policy of using unnecessary excessive force during arrests. The woman brought a federal lawsuit against the deputy involved as well as the Palm Beach County Sherriff's Office in the United States District Court for the Southern District of Florida, CASE No.: 12-81381-CIV-ROSENBAUM/SELTZER. The woman brought counts of False Arrest against the deputy and PBSO, Negligent Hiring and Retention against PBSO, Excessive Use of Force in Violation of 42 U.S.C § 1983 against the deputy and PBSO, Violation of First Amendment Denial of Right to Free Speech against the deputy, and Violation of Initiation and Pursuit of Prosecution without Probable Cause against Bradshaw. The parties resolved this matter outside of court with terms of the settlement being reported by the Palm Beach Post and Sun Sentinel.

b.       On or about November 14, 2010, in Pahokee, Florida, a neighbor was peacefully standing in his sister's front yard when he observed a traffic stop made by PBSO deputies. At the conclusion of the traffic stop, the deputies approached the neighbor, and without provocation or justification, grabbed him by the arms and waist, and slammed him to the ground. The neighbor was then immediately handcuffed and brutally beaten by the deputies, to include vicious stomps to the neighbor's back, neck and head. Without any probable cause or justification, the deputies arrested the neighbor for Resisting Arrest without Violence and Disorderly Intoxication. The State of Florida entered a Nolle Prosse as to all charges against the neighbor. Despite evidence supporting the unconstitutional excessive force of the deputies involved, PBSO took no disciplinary action against the deputies who inflicted this excessive force and false arrest and failed to properly investigate their actions due to the custom, practice, and policy of using unnecessary excessive force during arrests. The neighbor brought a federal lawsuit against the deputies involved as well as the Palm Beach County Sherriff's Office in the United States District Court for the Southern District of Florida, CASE No.: 12-81204. The arrestee brought counts of False Arrest/False Imprisonment against the deputies and PBSO, Excessive Use of Force in Violation of 42 U.S.C § 1983 against the deputies and PBSO, Battery against the deputies and PBSO, and Negligence against the deputies and PBSO. This matter was dismissed by stipulation of the parties with unknown settlement terms.

c.       On or about December 4, 2010, in West Palm Beach, Florida, PBSO deputies first, without justification or reason, deployed their taser on a mother's son who was sitting defenselessly and helplessly on the ground complying with requests of the deputies. Then, when the mother calmly objected, a deputy forcibly struck the mother in the forehead with the taser gun with such violence that it knocked the mother off her feet and lander her on her back

and knocked her unconscious. The deputies then arrested the mother and charged her with Battery on a Law Enforcement Officer. The State of Florida entered a Nolle Prosse on all criminal charges. Despite the fact that all non Law Enforcement witnesses disclosed and confirmed that the mother had never committed any such battery and that they were in total shock and disbelief when the deputy struck the mother, PBSO took no disciplinary action against the deputy who inflicted this excessive force and caused this false arrest and failed to properly investigate his actions due to the custom, practice, and policy of using unnecessary excessive force during arrests. The woman brought a federal lawsuit against the deputy involved as well as the Palm Beach County Sherriff's Office in the United States District Court for the Southern District of Florida, CASE No.: 12-80439. The woman brought counts of Negligence and False Arrest against the deputy and PBSO resulting from allegations of unconstitutional excessive force and an illegal arrest. This matter was dismissed by stipulation of the parties with unknown settlement terms.

      d.     On or about December 2, 2011, in Lake Worth, Florida, PBSO deputies were escorting a handcuffed and fully compliant arrestee to their patrol car, when without justification, they forcibly slammed the arrestee into the patrol car, tasered the handcuffed arrestee in excess of seven times, kicked and punched the handcuffed and compliant arrestee, and forcibly struck him over the head with a flashlight causing the arrestee's head to split open. Despite video evidence supporting the unconstitutional excessive force of the deputy involved, PBSO took no disciplinary action against this officer who inflicted this excessive force and failed to properly investigate his actions due to the custom, practice, and policy of using unnecessary excessive force during arrests. The arrestee brought a federal lawsuit against the deputies involved as well as the Palm Beach County Sherriff's Office in the United States District Court

for the Southern District of Florida, CASE No.: 13-80979-CV-Middlebrooks/Brannon. The arrestee brought counts of Excessive Use of Force in Violation of 42 U.S.C § 1983 against the deputies and PBSO, Malicious Prosecution, and Negligent Retention against PBSO. The parties resolved this matter outside of court with terms of the settlement being reported by the Palm Beach Post and Sun Sentinel.

     e. On or about November 6, 2012, in West Palm Beach, Florida, PBSO deputies approached a young black male who was sitting outside of his home. Without provocation or justification, the deputies and a West Palm Beach police officer went onto the young male's property and cornered him. As the young male attempted to retreat into his house, the deputies and officer manhandled the young black male, lifted him up in the air, and body slammed him onto the pavement. The deputies then jumped on top of the young male dropping their knees into the young male's neck, back, and head. While the deputies pinned him down and placed him in handcuffs, a West Palm Beach officer punched the young male multiple times in the face. Despite the absence of any probable cause that the young male had committed any crime, the Deputies and Officers filed police reports and made statements that were contrary to the true facts at hand. Despite evidence and statements from the West Palm Beach Officer's supporting the unconstitutional excessive force of the deputies involved, PBSO took no disciplinary action against the deputies who inflicted this excessive force and failed to properly investigate their actions due to the custom, practice, and policy of using unnecessary excessive force during arrests. The young male brought a federal lawsuit against the main deputy involved as well as the Palm Beach County Sherriff's Office in the United States District Court for the Southern District of Florida, CASE No.: 13-80996-CV-HURLEY/HOPKINS. The arrestee brought counts of Unreasonable Seizure and Excessive Use of Force in Violation of 42 U.S.C §

1983 against the deputy and PBSO, False Arrest/Imprisonment against the deputy and PBSO, and Negligent Retention against PBSO. The parties resolved this matter outside of court with terms of the settlement being reported by the Palm Beach Post and Sun Sentinel.

43.     What is more, examples of the above referenced pattern of similar incidents that occurred after the incident alleged in this Complaint are as follow:

a.      On or about January 2, 2014, in Palm Beach County, Florida, PBSO deputies struck an individual in the abdomen, face, and wrist during an arrest.  PBSO took no disciplinary action against these deputies who inflicted this excessive force and failed to properly investigate their actions due to the custom, practice, and policy of using unnecessary excessive force during arrests.

b.      On or about January 14, 2014, in Palm Beach County, Florida, PBSO deputies struck an individual in the knees and head to gain compliance.  Once on the ground, the deputies used five (5) drive stuns on the individual.  PBSO took no disciplinary action against these deputies who inflicted this excessive force and failed to properly investigate their actions due to the custom, practice, and policy of using unnecessary excessive force during arrests.

c.      On or about February 5, 2014, in Palm Beach County, Florida, PBSO deputies dragged a non-threatening woman by her hair and neck out of a DMV office.  PBSO took no disciplinary action against these deputies who inflicted this excessive force and failed to properly investigate their actions due to the custom, practice, and policy of using unnecessary excessive force during arrests.

44.     PBSO has maintained a long-standing, widespread history of failure to train, supervise, or otherwise discipline its police officers for, among other things, the use of excessive

force, unlawful detentions, and/or arrests even though it had notice of this unlawful conduct by its employees and the public.

45.     PBSO has maintained a system of review for abuses of lawful authority like the illegal use of force, unlawful detention, and/or arrests, among other things, by sworn law enforcement officers and complaints thereof, which has failed to identify improper use of force by police officers and to subject police officers who employed such acts to appropriate discipline, closer supervision, and/or retaining, to the extent that it has become the de facto policy and custom of PBSO to tolerate such acts by its officers.

46.     Indeed, PBSO routinely performs cursory investigations of incidents involving extremely questionable use of excessive force on the part of PBSO deputies, with an eye toward exonerating the deputy involved rather than finding out the truth.   Almost uniformly, investigators and supervisors uncritically endorse the deputies' versions of events, even when those versions are incomplete, inconsistent, or are in direct contradiction of objective evidence. The result is that these incidents involving questionable use of force are not properly and impartially investigated, documented, or addressed with corrective measures where warranted.

47.     Due to this intentionally inadequate investigative process, in virtually all excessive force incidents, PBSO has declared the conduct of its deputies to be justified, particularly in those involving non-threatening eyewitnesses.

48.     PBSO's foregoing acts, omissions, policies, or customs caused law enforcement officers, including Defendants PERRIN, CERCY, and STEPHAN, to believe that acts such as the improper use of force, unlawful detentions, unlawful arrests and the improper handling of incidents involving non-threatening eyewitnesses, would not be properly investigated.   The consistent lack of accountability within PBSO for the questionable and often unjustifiable use of

excessive force has promoted an acceptance of disproportionate, aggressive, and unconstitutional behavior towards ordinary citizens.  The resulting culture of aggression both promotes and condones intimidating and harsh approaches toward the citizenry, with the excessive use of force as a frequent and foreseeable outcome.

49.     Despite PBSO's notice and knowledge of the dangerous propensities of their sworn law enforcement officers because of said officers' lack of training, skill and/or experience, PBSO failed to implement any policies or programs to train said officers or otherwise intentionally failed to protect the public, including the Plaintiff, from its danger.

50.     PBSO had policies, customs, and practices that constituted deliberate indifference to Plaintiff's Constitutional Rights pursuant to the Fourth and Fourteenth Amendments, and PBSO's policies and customs caused the violation of Plaintiff's rights and/or was the moving force behind such Constitutional violations as indicated by the facts described above.

51.     PBSO's deliberate indifference towards CONBOY and other non-threatening eyewitnesses led to CONBOY being struck in the face, forcibly pushed down to the pavement, Tased twice when he was already bleeding from his face and lying on the pavement, and forcibly put in handcuffs when he was already under the physical control of the Defendants.

52.     The policies, customs, and practices complained of include, but are not limited to, the following:

a.     Deliberate indifference by failing to institute an appropriate policy for the detention of non-threatening eyewitnesses and by failing to enforce such a policy, if such a policy was in place;

b.     Deliberate indifference by failing to ensure that PBSO employees were sufficiently trained or otherwise educated in the extension and management of non-threatening

eyewitnesses from the perspective of the arresting officer(s), dispatch officers and supervising or managing officers;

       c.      Deliberate indifference by failing to provide sufficient supervision of the arrest in question and by failing to monitor the arrest in question;

       d.      Deliberate indifference by improperly training PBSO Deputies in such a way that condones, encourages, and permits their officers and agents to violate the rights and inflict harm upon persons being arrested;

       e.      Deliberate indifference by improperly training PBSO Deputies in such a way that condones, encourages, and permits their officers and agents to violate the rights and inflict harm upon non-threatening eyewitnesses they encounter;

       f.      Deliberate indifference in failing to properly supervise PBSO Deputies in their encounters with persons they arrest;

       g.      Deliberate indifference in failing to have Deputies properly reviewed for accurate use of force of incidents involving force used against arrested persons and non-threatening eyewitnesses, with conclusions frequently permitted to be drawn on the basis of clearly incorrect or contradictory information; and

       h.      Deliberate indifference in failing to determine whether said employees, including Defendants PERRIN, CERCY, and STEPHAN, posed a threat to the public as a result of their propensity to commit unlawful acts.

       53.      The Defendant PBSO was grossly and willfully negligent in the selection and/or training and/or supervision and/or retention of Defendants PERRIN, CERCY, and STEPHAN as sworn law enforcement officers of the Defendant PBSO, in that:

a.      It appointed said Defendants as sworn law enforcement officers when it knew or, in the exercise of reasonable care, should have known of the Defendants' dispositions to engage in such unlawful conduct.

b.      Despite the fact that it knew or should have known that this pattern of conduct was being carried out by its agents and employees, PBSO has failed to and refused to: (1) remove Defendants PERRIN, CERCY, and STEPHAN from their positions as sworn law enforcement officers; (2) take any disciplinary action against said Defendants; and (3) provide redress for citizens, such as the Plaintiff, who have been injured thereby.

54.     PBSO's deliberate indifference, failure to train, failure to effectively supervise, and its permission (and toleration of) the patterns and practices enumerated above, were the moving forces causing the serious injuries to Plaintiff and the violation of Plaintiff's Constitutional Rights.

55.     The actions of Defendants PERRIN, CERCY, and STEPHAN in this case, as well as the actions of Defendant PBSO in other similar situations, indicate that the officers who violated CONBOY's rights acted in accordance with PBSO's policies and reflect policies that were adopted by PBSO and their high ranking officials.

56.     The failure of PBSO to competently investigate use of force incidents and encounters with non-threatening eyewitnesses, and to institute appropriate disciplinary and retraining action in the wake of them, serves to tacitly condone the egregious misconduct of the officers involved. The agency's inaction in this regard effectively annuls its official general orders regarding the use of force and substitutes in their place a permissive de facto policy and custom of tolerating excessive force, which will invariably have the effect of promoting similar misconduct by other deputies in the future.  In sum, the pattern and practice of the excessive use

of force on the part of PBSO officers stems from systemic deficiencies in training and supervision and from the inadequate investigation and routine ratification of deadly and excessive force.

## COUNT I
### 42 U.S.C. § 1983 – Excessive Use of Force By Defendant PERRIN

57.     Plaintiff CONBOY realleges the allegations contained in Paragraphs 1 through 6, 10, and 13 through 32, as if fully set forth herein.

58.     The force used by Defendant PERRIN against Plaintiff during the course of Plaintiff's arrest was objectively inhuman and unnecessary, and constituted the unreasonable and excessive use of force in violation of Plaintiff's clearly established constitutional rights under the Fourth and Fourteenth Amendments and 42 U.S.C. § 1983.

59.     Defendant PERRIN used unreasonable and excessive force against Plaintiff when, with a depraved indifference to human life and conscious disregard for the safety of the general public, PERRIN forcibly pushed Plaintiff down to the pavement, struck Plaintiff's face against the hood of his car, used a Taser gun twice against Plaintiff when he was already bleeding from his face and laying on the pavement, and forcibly put Plaintiff in handcuffs when he was already under the physical control of the Defendants.

60.     Defendant PERRIN committed the acts described hereinabove in a gross disregard of Plaintiff's constitutional rights while acting under color of law, and specifically deprived Plaintiff of his constitutional right to be free from excessive police force under the Fourth Amendment.

61.     As a result of Defendant PERRIN's outrageous conduct, Plaintiff required immediate medical care.

62.     As a further direct and proximate result of Defendant PERRIN's conduct, Plaintiff suffered loss of his liberty and freedom, bodily injury and resulting pain and suffering, mental anguish, and medical expenses for treatment and care.  These losses are either permanent or continuing, and Plaintiff will suffer the losses in the future, in violation of his civil rights. Plaintiff has also agreed to pay the undersigned a reasonable attorney fee for services provided.

WHEREFORE, Plaintiff prays for the following relief:

a.   Judgment for compensatory damages in excess of $100,000.00;

b.   Judgment for exemplary or punitive damages;

c.   Cost of suit;

d.   Reasonable attorney fees, pursuant to 42 U.S.C. § 1983;

e.   Trial by jury as to all issues so triable; and

f.   Such other relief as this Honorable Court may deem just and appropriate.

**COUNT II**
**42 U.S.C. § 1983 – Excessive Use of Force By Defendant CERCY**

63.     Plaintiff CONBOY realleges the allegations contained in Paragraphs 1 through 5, 7, 11, 13 through 32, as if fully set forth herein.

64.     The force used by Defendant CERCY against Plaintiff during the course of Plaintiff's arrest was objectively inhuman and unnecessary, and constituted the unreasonable and excessive use of force in violation of Plaintiff's clearly established constitutional rights under the Fourth and Fourteenth Amendments and 42 U.S.C. § 1983.

65.     Defendant CERCY used unreasonable and excessive force against Plaintiff when, with a depraved indifference to human life and conscious disregard for the safety of the general public, CERCY forcibly pushed Plaintiff down to the pavement, struck Plaintiff's face against the hood of his car, used a Taser gun twice against Plaintiff when he was already bleeding from

his face and laying on the pavement, and forcibly put Plaintiff in handcuffs when he was already under the physical control of the Defendants.

66.     Defendant CERCY committed the acts described hereinabove in a gross disregard of Plaintiff's constitutional rights while acting under color of law, and specifically deprived Plaintiff of his constitutional right to be free from excessive police force under the Fourth Amendment.

67.     At no time was CONBOY under suspicion of committing any crime.  At no time did he pose any threat of violence to any Defendant.

68.     As a result of Defendant CERCY's outrageous conduct, Plaintiff required immediate medical care.

69.     As a further direct and proximate result of Defendant CERCY's conduct, Plaintiff suffered loss of his liberty and freedom, bodily injury and resulting pain and suffering, mental anguish, and medical expenses for treatment and care.  These losses are either permanent or continuing, and Plaintiff will suffer the losses in the future, in violation of his civil rights. Plaintiff has also agreed to pay the undersigned a reasonable attorney fee for services provided.

WHEREFORE, Plaintiff prays for the following relief:

g.  Judgment for compensatory damages in excess of $100,000.00;

h.  Judgment for exemplary or punitive damages;

i.  Cost of suit;

j.  Reasonable attorney fees, pursuant to 42 U.S.C. § 1983;

k.  Trial by jury as to all issues so triable; and

l.  Such other relief as this Honorable Court may deem just and appropriate.

<u>**COUNT III**</u>
**42 U.S.C. § 1983 – Excessive Use of Force By Defendant STEPHAN**

70.     Plaintiff CONBOY realleges the allegations contained in Paragraphs 1 through 5, 8, 12, and 13 through 32, as if fully set forth herein.

71.     The force used by Defendant STEPHAN against Plaintiff during the course of Plaintiff's arrest was objectively inhuman and unnecessary, and constituted the unreasonable and excessive use of force in violation of Plaintiff's clearly established constitutional rights under the Fourth and Fourteenth Amendments and 42 U.S.C. § 1983.

72.     Defendant STEPHAN used unreasonable and excessive force against Plaintiff when, with a depraved indifference to human life and conscious disregard for the safety of the general public, STEPHAN forcibly pushed Plaintiff down to the pavement, struck Plaintiff's face against the hood of his car, used a Taser gun twice against Plaintiff when he was already bleeding from his face and laying on the pavement, and forcibly put Plaintiff in handcuffs when he was already under the physical control of the Defendants.

73.     Defendant STEPHAN committed the acts described hereinabove in a gross disregard of Plaintiff's constitutional rights while acting under color of law, and specifically deprived Plaintiff of his constitutional right to be free from excessive police force under the Fourth Amendment.

74.     At no time was CONBOY under suspicion of committing any crime.  At no time did he pose any threat of violence to any Defendant.

75.     As a result of Defendant STEPHAN's outrageous conduct, Plaintiff required immediate medical care.

76.     As a further direct and proximate result of Defendant STEPHAN's conduct, Plaintiff suffered loss of his liberty and freedom, bodily injury and resulting pain and suffering,

mental anguish, and medical expenses for treatment and care.  These losses are either permanent or continuing, and Plaintiff will suffer the losses in the future, in violation of his civil rights. Plaintiff has also agreed to pay the undersigned a reasonable attorney fee for services provided.

WHEREFORE, Plaintiff prays for the following relief:

m.  Judgment for compensatory damages in excess of $100,000.00;

n.  Judgment for exemplary or punitive damages;

o.  Cost of suit;

p.  Reasonable attorney fees, pursuant to 42 U.S.C. § 1983;

q.  Trial by jury as to all issues so triable; and

r.  Such other relief as this Honorable Court may deem just and appropriate.

## COUNT IV
### 42 U.S.C. § 1983 - Deliberate Indifference by Defendant PBSO

77.  Plaintiff CONBOY realleges the allegations contained in Paragraphs 1 through 9, and 13 through 56 as if fully set forth herein.

78.  Defendant PBSO violated the Plaintiff's Fourth Amendment rights by failing to train its deputies to reasonably respond to individuals that are non-threatening and by engaging in policies and practices that caused constitutional violations to people that are non-threatening by inappropriately responding to non-threatening situations with excessive force.

79.  These constitutional violations were caused by PBSO's lack of training and supervision in regards to deputies having the ability and knowledge to appropriately interact with non-threatening eyewitnesses without causing physical injury.

80.  Defendants PERRIN, CERCY, and STEPHAN knew or should have known that CONBOY was non-threatening, and they should have known that any use of force was objectively unreasonable in light of the totality of the circumstances.

27

81.     The force used by PBSO deputies against Plaintiff CONBOY during his arrest was objectively inhuman and unnecessary and constituted the unreasonable and excessive use of force, in violation of the Plaintiff's clearly established constitutional rights under the Fourth and Fourteenth Amendments and 42 U.S.C. § 1983.

82.     At no time was CONBOY under suspicion of committing any crime.  At no time did he pose any threat of violence to any Defendant.

83.     As a result of the outrageous conduct of PBSO, Plaintiff required immediate emergency medical care.

84.     As a further direct and proximate result of the conduct of Defendant PBSO, Plaintiff CONBOY suffered loss of his liberty and freedom, bodily injury and resulting pain and suffering, mental anguish, and medical expenses for treatment and care.  These losses are either permanent or continuing, and CONBOY will suffer the losses in the future, in violation of his civil rights.  Plaintiff has also agreed to pay the undersigned a reasonable attorney fee for services provided.

WHEREFORE, Plaintiff prays for the following relief:

a.   Judgment for compensatory damages in excess of $100,000.00;

b.   Judgment for exemplary or punitive damages;

c.   Cost of suit;

d.   Reasonable attorney fees, pursuant to 42 U.S.C. § 1983;

e.   Trial by jury as to all issues so triable; and

f.   Such other relief as this Honorable Court may deem just and appropriate.

<u>**COUNT V**</u>
**42 U.S.C. § 1983 Claim Against Defendant PBSO [Ric L. Bradshaw, in his capacity as
Sheriff of Palm Beach County, Florida] For Supervisory Liability**

85.     Plaintiff CONBOY realleges the allegations contained in Paragraphs 1 through 9,
and 13 through 56 as if fully set forth herein.

86.     Defendant PBSO violated CONBOY's Fourth Amendment freedom from being
subjected to excessive force and Fourteenth Amendment substantive due process when PBSO
failed to adequately train deputies/officers to respond to calls involving non-threatening
eyewitnesses.

87.     PBSO's chief policy maker, Sheriff Bradshaw, is responsible for the
implementation and promulgation of official policies for PBSO.  Further, Sheriff Bradshaw is
responsible for the promulgation of policies and the implementation of training to maintain an
effective police force that is capable and prepared to deal with encounters with non-threatening
eyewitnesses.

88.     PBSO was deliberately indifferent to its responsibility to adequately prepare its
deputies/officers for encounters with non-threatening eyewitnesses and for their interaction with,
detention, and arrest of the same.

89.     PBSO knew or should have known, due to the large number of non-threatening
individuals in Palm Beach County and the large number of situations in which these individuals
are eyewitnesses to crimes or accidents, that its deputies/officers would routinely encounter non-
threatening eyewitnesses and that these deputies/officers would need to be aware of the
appropriate methods of escalation from detention to arrest of a non-threatening eyewitness.

90.     PBSO is charged with properly training officers with the available and necessary non-deadly-force skills that would allow officers to investigate a situation involving non-threatening eyewitnesses and also maintain their own safety.

91.     PBSO was deliberately indifferent to its responsibility to create an effectively trained police force that could adequately respond to the scene of encounters with non-threatening eyewitnesses.  All of the conduct at the scene to investigate the Plaintiff's situation was contrary to established police methods for interacting with non-threatening persons.

92.     Thus, there were no sufficiently trained deputies available to reasonably and effectively deal with the Plaintiff's situation as an eyewitness of a traffic fatality.  All of the acts and omissions of the insufficiently trained officers were inappropriate to the situation and caused the encounter to be escalated.

93.     Further, the officers were not provided with sufficiently detailed policies and procedures to use in investigating a situation involving non-threatening eyewitnesses.  These officers did not have the adequate direction or assistance with which to respond to the incident that occurred on September 29, 2013.

94.     All of the above referenced failures are the responsibility of PBSO, which was deliberately indifferent to its responsibility to have appropriate policies and procedures in place and to train and supervise officers employed by PBSO to deal with the recurring situation of responding to calls involving non-threatening eyewitnesses.

95.     As a further direct and proximate result of the conduct described above, Plaintiff CONBOY suffered loss of his liberty and freedom, bodily injury and resulting pain and suffering, mental anguish, and medical expenses for treatment and care.  These losses are either permanent or continuing, and CONBOY will suffer the losses in the future, in violation of his

civil rights.  Plaintiff has also agreed to pay the undersigned a reasonable attorney fee for services provided.

WHEREFORE, Plaintiff prays for the following relief:

a.   Judgment for compensatory damages in excess of $100,000.00;

b.   Judgment for exemplary or punitive damages;

c.   Cost of suit;

d.   Reasonable attorney fees, pursuant to 42 U.S.C. § 1983;

e.   Trial by jury as to all issues so triable; and

f.   Such other relief as this Honorable Court may deem just and appropriate.

<u>COUNT VI</u>
**Battery Against Defendant PERRIN**

96.     Plaintiff CONBOY realleges the allegations contained in Paragraphs 1 through 6, 10, and 13 through 32 as if fully set forth herein.

97.     Defendant PERRIN's actions against CONBOY, when he used unreasonable and excessive force to push CONBOY down to the pavement, strike his face against the hood of his car, use a Taser gun twice against him, and put him in handcuffs, with a depraved indifference to human life and conscious disregard for the safety of the general public, constituted an intentional unwelcome and unprivileged touching of CONBOY, and was undertaken in bad faith and with actual malice.

98.     As a further direct and proximate result of the conduct described above, Plaintiff suffered loss of his liberty and freedom, bodily injury and resulting pain and suffering, mental anguish, and medical expenses for treatment and care.  These losses are either permanent or continuing, and Plaintiff will suffer the losses in the future, in violation of his civil rights. Plaintiff has also agreed to pay the undersigned a reasonable attorney fee for services provided.

WHEREFORE, Plaintiff CONBOY prays for the following relief:

    a.  Judgment for compensatory damages in excess of $100,000.00;

    b.  Judgment for exemplary or punitive damages;

    c.  Cost of suit;

    d.  Reasonable attorney fees, pursuant to 42 U.S.C. § 1983;

    e.  Trial by jury as to all issues so triable; and

    f.  Such other relief as this Honorable Court may deem just and appropriate.

### COUNT VII
### Battery Against Defendant CERCY

99.    Plaintiff CONBOY realleges the allegations contained in Paragraphs 1 through 5, 7, 11, and 13 through 32 as if fully set forth herein.

100.    Defendant CERCY's actions against CONBOY, when he used unreasonable and excessive force to push CONBOY down to the pavement, strike his face against the hood of his car, use a Taser gun twice against him, and put him in handcuffs, with a depraved indifference to human life and conscious disregard for the safety of the general public, constituted an intentional unwelcome and unprivileged touching of CONBOY, and was undertaken in bad faith and with actual malice.

101.    As a further direct and proximate result of the conduct described above, Plaintiff suffered loss of his liberty and freedom, bodily injury and resulting pain and suffering, mental anguish, and medical expenses for treatment and care.  These losses are either permanent or continuing, and Plaintiff will suffer the losses in the future, in violation of his civil rights. Plaintiff has also agreed to pay the undersigned a reasonable attorney fee for services provided.

WHEREFORE, Plaintiff CONBOY prays for the following relief:

    g.  Judgment for compensatory damages in excess of $100,000.00;

     h.  Judgment for exemplary or punitive damages;

     i.  Cost of suit;

     j.  Reasonable attorney fees, pursuant to 42 U.S.C. § 1983;

     k.  Trial by jury as to all issues so triable; and

     l.  Such other relief as this Honorable Court may deem just and appropriate.

## COUNT VIII
### Battery Against Defendant STEPHAN

102.    Plaintiff CONBOY realleges the allegations contained in Paragraphs 1 through 5, 8, 12, and 13 through 32 as if fully set forth herein.

103.    Defendant STEPHAN's actions against CONBOY, when he used unreasonable and excessive force to push CONBOY down to the pavement, strike his face against the hood of his car, use a Taser gun twice against him, and put him in handcuffs, with a depraved indifference to human life and conscious disregard for the safety of the general public, constituted an intentional unwelcome and unprivileged touching of CONBOY, and was undertaken in bad faith and with actual malice.

104.    As a further direct and proximate result of the conduct described above, Plaintiff suffered loss of his liberty and freedom, bodily injury and resulting pain and suffering, mental anguish, and medical expenses for treatment and care.  These losses are either permanent or continuing, and Plaintiff will suffer the losses in the future, in violation of his civil rights. Plaintiff has also agreed to pay the undersigned a reasonable attorney fee for services provided.

WHEREFORE, Plaintiff CONBOY prays for the following relief:

     m.  Judgment for compensatory damages in excess of $100,000.00;

     n.  Judgment for exemplary or punitive damages;

     o.  Cost of suit;

    p.    Reasonable attorney fees, pursuant to 42 U.S.C. § 1983;

    q.    Trial by jury as to all issues so triable; and

    r.    Such other relief as this Honorable Court may deem just and appropriate.

**COUNT IX**
**Battery Against Defendant PBSO**
**(Pleaded in the Alternative Pursuant to Federal Rule of Civil Procedure 8(d)(2).)**

105.    Plaintiff CONBOY realleges the allegations contained in Paragraphs 1 through 9, and 13 through 33 as if fully set forth herein.

106.    Defendants PERRIN, CERCY, and STEPHAN's actions against CONBOY, when they used unreasonable and excessive force to push CONBOY down to the pavement, strike his face against the hood of his car, use a Taser gun twice against him, and put him in handcuffs, constituted an intentional unwelcome and unprivileged touching of CONBOY.

107.    Defendants PERRIN, CERCY, and STEPHAN were acting within the scope of their employment with PBSO.

108.    As a further direct and proximate result of the conduct described above, Plaintiff CONBOY suffered loss of his liberty and freedom, bodily injury and resulting pain and suffering, mental anguish, and medical expenses for treatment and care.  These losses are either permanent or continuing, and CONBOY will suffer the losses in the future, in violation of his civil rights.  Plaintiff has also agreed to pay the undersigned a reasonable attorney fee for services provided.

WHEREFORE, Plaintiff CONBOY prays for the following relief:

    a.    Judgment for compensatory damages in excess of $100,000.00;

    b.    Judgment for exemplary or punitive damages;

    c.    Cost of suit;

d.   Reasonable attorney fees, pursuant to 42 U.S.C. § 1983;

e.   Trial by jury as to all issues so triable; and

f.   Such other relief as this Honorable Court may deem just and appropriate.

**COUNT X**
**42 U.S.C. § 1983 – False Arrest/False Imprisonment Claim Against Defendant PERRIN**

109.   Plaintiff CONBOY realleges the allegations contained in Paragraphs 1 through 6, 10, and 13 through 32 as if fully set forth herein.

110.   As set forth above, through his direct actions, Defendant PERRIN personally participated in and caused the false arrest and false imprisonment of Plaintiff CONBOY.

111.   In an effort to cover up his illegal use of force, unlawful detention, improper handling of the incident involving a non-threatening eyewitness, and overall gross negligence, Defendant PERRIN, with the assistance of other PBSO officers, exaggerated the facts of the incident that occurred on September 29, 2013.

112.   In as much as Defendant PERRIN knew or should have known that CONBOY was a non-threatening eyewitness, PERRIN's actions when arresting CONBOY, in the absence of probable cause or arguable probable cause, were taken without lawful authority.   Therefore, said actions constitute the false arrest and false imprisonment of CONBOY.

113.   As a further direct and proximate result of the conduct described above, Plaintiff CONBOY suffered loss of his liberty and freedom, bodily injury and resulting pain and suffering, mental anguish, and medical expenses for treatment and care.   These losses are either permanent or continuing, and CONBOY will suffer the losses in the future, in violation of his civil rights.   Plaintiff has also agreed to pay the undersigned a reasonable attorney fee for services provided.

WHEREFORE, Plaintiff CONBOY prays for the following relief:

a.  Judgment for compensatory damages in excess of $100,000.00;

b.  Judgment for exemplary or punitive damages;

c.  Cost of suit;

d.  Reasonable attorney fees, pursuant to 42 U.S.C. § 1983;

e.  Trial by jury as to all issues so triable; and

f.  Such other relief as this Honorable Court may deem just and appropriate.

<u>**COUNT XI**</u>
**42 U.S.C. § 1983 – False Arrest/False Imprisonment Claim Against Defendant CERCY**

114.   Plaintiff CONBOY realleges the allegations contained in Paragraphs 1 through 5, 7, 11, and 13 through 32 as if fully set forth herein.

115.   As set forth above, through his direct actions, Defendant CERCY personally participated in and caused the false arrest and false imprisonment of Plaintiff CONBOY.

116.   In an effort to cover up his illegal use of force, unlawful detention, improper handling of the incident involving a non-threatening eyewitness, and overall gross negligence, Defendant CERCY, with the assistance of other PBSO officers, exaggerated the facts of the incident that occurred on September 29, 2013.

117.   In as much as Defendant CERCY knew or should have known that CONBOY was a non-threatening eyewitness, CERCY's actions when arresting CONBOY, in the absence of probable cause or arguable probable cause, were taken without lawful authority.  Therefore, said actions constitute the false arrest and false imprisonment of CONBOY.

118.   As a further direct and proximate result of the conduct described above, Plaintiff CONBOY suffered loss of his liberty and freedom, bodily injury and resulting pain and suffering, mental anguish, and medical expenses for treatment and care.  These losses are either

permanent or continuing, and CONBOY will suffer the losses in the future, in violation of his civil rights.   Plaintiff has also agreed to pay the undersigned a reasonable attorney fee for services provided.

WHEREFORE, Plaintiff CONBOY prays for the following relief:

     g.   Judgment for compensatory damages in excess of $100,000.00;

     h.   Judgment for exemplary or punitive damages;

     i.   Cost of suit;

     j.   Reasonable attorney fees, pursuant to 42 U.S.C. § 1983;

     k.   Trial by jury as to all issues so triable; and

     l.   Such other relief as this Honorable Court may deem just and appropriate.

## COUNT XII
### 42 U.S.C. § 1983 – False Arrest/False Imprisonment Claim Against Defendant STEPHAN

119.   Plaintiff CONBOY realleges the allegations contained in Paragraphs 1 through 5, 8, 12, and 13 through 32 as if fully set forth herein.

120.   As set forth above, through his direct actions, Defendant STEPHAN personally participated in and caused the false arrest and false imprisonment of Plaintiff CONBOY.

121.   In an effort to cover up his illegal use of force, unlawful detention, improper handling of the incident involving a non-threatening eyewitness, and overall gross negligence, Defendant STEPHAN, with the assistance of other PBSO officers, exaggerated the facts of the incident that occurred on September 29, 2013.

122.   In as much as Defendant STEPHAN knew or should have known that CONBOY was a non-threatening eyewitness, STEPHAN's actions when arresting CONBOY, in the absence of probable cause or arguable probable cause, were taken without lawful authority. Therefore, said actions constitute the false arrest and false imprisonment of CONBOY.

123.    As a further direct and proximate result of the conduct described above, Plaintiff CONBOY suffered loss of his liberty and freedom, bodily injury and resulting pain and suffering, mental anguish, and medical expenses for treatment and care.  These losses are either permanent or continuing, and CONBOY will suffer the losses in the future, in violation of his civil rights.  Plaintiff has also agreed to pay the undersigned a reasonable attorney fee for services provided.

WHEREFORE, Plaintiff CONBOY prays for the following relief:

m.  Judgment for compensatory damages in excess of $100,000.00;

n.  Judgment for exemplary or punitive damages;

o.  Cost of suit;

p.  Reasonable attorney fees, pursuant to 42 U.S.C. § 1983;

q.  Trial by jury as to all issues so triable; and

r.  Such other relief as this Honorable Court may deem just and appropriate.

## COUNT XIII
### 42 U.S.C. § 1983 – False Arrest/False Imprisonment Claim Against Defendant PBSO [Ric L. Bradshaw, in his capacity as Sheriff of Palm Beach County]

124.    Plaintiff CONBOY realleges the allegations contained in Paragraphs 1 through 9 and 13 through 33 as if fully set forth herein.

125.    As set forth above, through their direct actions, Defendants PERRIN, CERCY, and STEPHAN personally participated in and caused the false arrest and false imprisonment of CONBOY.

126.    In an effort to cover up their illegal use of force, unlawful detention, improper handling of the incident involving a non-threatening eyewitness, and overall gross negligence,

Defendants PERRIN, CERCY, and STEPHAN, with the assistance of other PBSO officers, exaggerated the facts of the incident that occurred on September 29, 2013.

127.    In as much as Defendants PERRIN, CERCY, and STEPHAN knew or should have known that CONBOY was a non-threatening eyewitness, PERRIN, CERCY, and STEPHAN's actions when arresting CONBOY, in the absence of probable cause or arguable probable cause, were taken without lawful authority.  Therefore, said actions constitute the false arrest and false imprisonment of CONBOY.

128.    Defendants PERRIN, CERCY, and STEPHAN were acting within the scope of their employment with PBSO.

129.     As a further direct and proximate result of the conduct described above, Plaintiff CONBOY suffered loss of his liberty and freedom, bodily injury and resulting pain and suffering, mental anguish, and medical expenses for treatment and care.  These losses are either permanent or continuing, and Plaintiff will suffer the losses in the future, in violation of his civil rights.  Plaintiff has also agreed to pay the undersigned a reasonable attorney fee for services provided.

WHEREFORE, Plaintiff CONBOY prays for the following relief:

a.  Judgment for compensatory damages in excess of $100,000.00;

b.  Judgment for exemplary or punitive damages;

c.  Cost of suit;

d.  Reasonable attorney fees, pursuant to 42 U.S.C. § 1983;

e.  Trial by jury as to all issues so triable; and

f.  Such other relief as this Honorable Court may deem just and appropriate.

## COUNT XIV
**Malicious Prosecution Against Defendant PERRIN**

130.    Plaintiff CONBOY realleges the allegations contained in Paragraphs 1 through 6, 10, and 13 through 32 as if fully set forth herein.

131.    Defendant PERRIN wrongfully caused criminal proceedings to be instituted against Plaintiff CONBOY with malice and absence of probable cause, or arguable probable cause, by submitting police reports to prosecuting authorities containing false statements and/or material omissions, which reports were relied upon by prosecuting authorities.

132.    Based on the elaborate story Defendant PERRIN fabricated, the State Attorney's Office brought five (5) criminal charges against Plaintiff, namely one count of Battery on a Law Enforcement Officer, one count of Resisting Officer with Violence, one count of Attempting to Deprive Officer of Protection or Communication, one count of Corruption by Threat Against a Public Official, and one count of Disorderly Intoxication.  These charges were ultimately "no-filed" by the State Attorney's Office.

133.    As a direct and proximate result of the conduct of Defendant PERRIN, Plaintiff CONBOY suffered loss of his liberty and freedom, bodily injury and resulting pain and suffering, mental anguish, and medical expenses for treatment and care.  These losses are either permanent or continuing, and Plaintiff will suffer the losses in the future, in violation of his civil rights.  Plaintiff has also agreed to pay the undersigned a reasonable attorney fee for services provided.

WHEREFORE, Plaintiff CONBOY prays for the following relief:

     a.  Judgment for compensatory damages in excess of $100,000.00;

     b.  Judgment for exemplary or punitive damages;

     c.  Cost of suit;

    d.   Reasonable attorney fees, pursuant to 42 U.S.C. § 1983;

    e.   Trial by jury as to all issues so triable; and

    f.   Such other relief as this Honorable Court may deem just and appropriate.

<u>**COUNT XV**</u>
**Malicious Prosecution Against Defendant CERCY**

134.    Plaintiff CONBOY realleges the allegations contained in Paragraphs 1 through 5, 7, 11, and 13 through 32 as if fully set forth herein.

135.    Defendant CERCY wrongfully caused criminal proceedings to be instituted against Plaintiff CONBOY with malice and absence of probable cause, or arguable probable cause, by submitting police reports to prosecuting authorities containing false statements and/or material omissions, which reports were relied upon by prosecuting authorities.

136.    Based on the elaborate story Defendant CERCY fabricated, the State Attorney's Office brought five (5) criminal charges against Plaintiff, namely one count of Battery on a Law Enforcement Officer, one count of Resisting Officer with Violence, one count of Attempting to Deprive Officer of Protection or Communication, one count of Corruption by Threat Against a Public Official, and one count of Disorderly Intoxication.  These charges were ultimately "no-filed" by the State Attorney's Office.

137.    As a direct and proximate result of the conduct of Defendant CERCY, Plaintiff CONBOY suffered loss of his liberty and freedom, bodily injury and resulting pain and suffering, mental anguish, and medical expenses for treatment and care.  These losses are either permanent or continuing, and Plaintiff will suffer the losses in the future, in violation of his civil rights.  Plaintiff has also agreed to pay the undersigned a reasonable attorney fee for services provided.

WHEREFORE, Plaintiff CONBOY prays for the following relief:

a.  Judgment for compensatory damages in excess of $100,000.00;

b.  Judgment for exemplary or punitive damages;

c.  Cost of suit;

d.  Reasonable attorney fees, pursuant to 42 U.S.C. § 1983;

e.  Trial by jury as to all issues so triable; and

f.  Such other relief as this Honorable Court may deem just and appropriate.

## COUNT XVI
### Malicious Prosecution Against Defendant STEPHAN

138.    Plaintiff CONBOY realleges the allegations contained in Paragraphs 1 through 5, 8, 12, and 13 through 32 as if fully set forth herein.

139.    Defendant STEPHAN wrongfully caused criminal proceedings to be instituted against Plaintiff CONBOY with malice and absence of probable cause, or arguable probable cause, by submitting police reports to prosecuting authorities containing false statements and/or material omissions, which reports were relied upon by prosecuting authorities.

140.    Based on the elaborate story Defendant STEPHAN fabricated, the State Attorney's Office brought five (5) criminal charges against Plaintiff, namely one count of Battery on a Law Enforcement Officer, one count of Resisting Officer with Violence, one count of Attempting to Deprive Officer of Protection or Communication, one count of Corruption by Threat Against a Public Official, and one count of Disorderly Intoxication.  These charges were ultimately "no-filed" by the State Attorney's Office.

141.    As a direct and proximate result of the conduct of Defendant STEPHAN, Plaintiff CONBOY suffered loss of his liberty and freedom, bodily injury and resulting pain and suffering, mental anguish, and medical expenses for treatment and care.  These losses are either

42

permanent or continuing, and Plaintiff will suffer the losses in the future, in violation of his civil rights.  Plaintiff has also agreed to pay the undersigned a reasonable attorney fee for services provided.

WHEREFORE, Plaintiff CONBOY prays for the following relief:

a.  Judgment for compensatory damages in excess of $100,000.00;

b.  Judgment for exemplary or punitive damages;

c.  Cost of suit;

d.  Reasonable attorney fees, pursuant to 42 U.S.C. § 1983;

e.  Trial by jury as to all issues so triable; and

f.  Such other relief as this Honorable Court may deem just and appropriate.

<u>**COUNT XVII**</u>
**Negligent Hiring Against Defendant PBSO as to**
**Defendant PERRIN**

142.    Plaintiff CONBOY realleges the allegations contained in Paragraphs 1 through 9, 13 through 34, 36, 38, 40, and 48 through 56 as if fully set forth herein.

143.    At the time Defendants PERRIN was hired by PBSO, his employment was conditional upon completion of the following examinations:

a.    Computerized Voice Stress Analyzer ("CVSA")
b.    Psychological Evaluation
c.    Background Investigation
d.    Medical Examination
e.    Drug Screen
f.    Sheriff's Approval

144.    Defendant PBSO failed to properly screen Defendant PERRIN based on the above-listed examinations.

145.    Namely, PBSO failed to properly investigate Defendant PERRIN's arrest history and driving history.  It is known that Defendant PERRIN was arrested under the suspicion of Driving Under the Influence of alcohol.

146.    Specifically, in February of 2002, Defendant PERRIN was arrested by Webster County Sheriff's Office in Webster County Kentucky following a DUI investigation. Defendant PERRIN was in the car with some high school classmates coming home from a house-party when he was pulled over for running a stop-sign. The officers on scene indicated that Defendant PERRIN's car "smelled like a brewery." Defendant PERRIN was charged with possession of Alcohol by a Minor and Driving Under the Influence. Defendant PERRIN ultimately pled guilty to Possession of Alcohol by a Minor and Running a Stop Sign.

147.    Defendant PBSO could have foreseen, at the time of hiring, the danger Defendant PERRIN presented to Plaintiff and all other non-threatening persons or eyewitnesses.

148.    Based on its failure to properly screen Defendant PERRIN, it was unreasonable for PBSO to hire Defendant PERRIN in light of information that it knew or should have known.

149.    As a result of Defendant PBSO's negligent hiring of Defendant PERRIN, the injuries sustained by Plaintiff were within the zone of foreseeable risks.

150.    As a direct and proximate result of the conduct described above, Plaintiff suffered loss of his liberty and freedom, bodily injury and resulting pain and suffering, disability, disfigurement, mental anguish, expense of medical care and treatment.  These losses are either permanent or continuing, and Plaintiff will suffer the losses in the future, in violation of his civil rights.  Plaintiff has also agreed to pay the undersigned a reasonable attorney fee for his services herein.

WHEREFORE, Plaintiff CONBOY prays for the following relief:

a.      Judgment for compensatory damages;

b.      Judgment for exemplary or punitive damages;

c.      Cost of suit;

d.      Reasonable attorney's fees;

e.      Trial by jury as to all issues so triable; and

f.      Such other relief as this Honorable Court may deem just and appropriate.

### COUNT XVIII
### Negligent Retention Against Defendant PBSO as to
### Defendants PERRIN, CERCY, and STEPHAN

151.    Plaintiff CONBOY realleges the allegations contained in Paragraphs 1 through 9, 13 through 34, 36, 38, 40, and 45 through 56  as if fully set forth herein.

***Defendant PBSO's Negligent Retention As To Defendant PERRIN***

152.    At all times relevant and material hereto, Defendant PERRIN was employed by Defendant PBSO as a Certified Sworn Law Enforcement Officer.

153.    Defendant PBSO was aware, or should have become aware, of problems with Defendant PERRIN that indicated his unfitness for duty as a Certified Sworn Law Enforcement Officer.

154.    Specifically, as a result of an incident that occurred on March 16, 2006, while Defendant PERRIN was still in the field training stage of his employment with Defendant PBSO, it was alleged that Defendant PERRIN, while off duty and waiting in a drive through at McDonalds, pulled out his gun and flashed his badge after an individual threw a Gatorade bottle out his window. Defendant PERRIN specifically was quoted as saying "Don't litter in my city! Do It. Go Ahead, Do it again, Try Me!." Defendant PERRIN then sped away from the drive thru.

When the individual reported Defendant PERRIN's conduct, officers tracked down Defendant PERRIN and a felony car stop ultimately occurred. After a DUI investigation was completed which resulted in the determination that Defendant PERRIN had been drinking, a supervising officer drove Defendant PERRIN home. Defendant PERRIN wrote a letter of apology to Sherriff Bradshaw apologizing for his embarrassing conduct. Despite such egregious and embarrassing conduct, Defendant Perrin was found to have not violated PBSO policies and received no discipline.

155.    On August 29, 2007, PBSO was notified that Defendant PERRIN had been involved in six Use of Force incidents within the last year (01/22/07, 03/10/07, 03/25/07, 03/25/07, 05/29/07 and 08/17/07), and that his decision to use force may need to be reviewed. The reviewing supervisor for Defendant PBSO determined that Defendant PERRIN should now be monitored. Each of these incidents involved Defendant PERRIN using force (armbar takedown, taser, and/or OC spray) on persons he was arresting, and in four of these incidents Defendant PERRIN caused injury to the arrestee.

156.    On September 01, 2007, Defendant PERRIN was again involved in a Use of Force incident and Defendant PBSO was again notified. The reviewing supervisor for Defendant PBSO again determined that Defendant PERRIN should be monitored.

157.    On December 21, 2007, Defendant PERRIN was again involved in a Use of Force incident and Defendant PBSO was again notified. Yet again, Defendant PERRIN utilized an arm-bar takedown and deployed his Taser on an allegedly non-compliant arrestee. Again, the arrestee sustained injuries. Despite eight use of force instances within one year, the reviewing supervisor for Defendant PBSO still only determined that Defendant PERRIN should be monitored.

158.    On July 1, 2010, Defendant PBSO was again notified that Defendant PERRIN had been involved in five Use of Force incidents within the last year (10/02/09, 11/24/09, 03/04/10, 04/07/10, and 06/06/10), and that his decision to use force may need to be reviewed. Lieutenant Michael Reardon met with Defendant PERRIN on July 12, 2010 regarding his involvement in these five uses of force. It was determined that all uses of force (all involving Defendant PERRIN using force on an arrestee to "gain control") where "justified" and Lt. Reardon noted that "Deputy Perrin has made over 140 DUI arrests during the last 18 months and as we all know drunks can be rather difficult to deal with."  Defendant PERRIN was informed that further uses of force would be monitored.

159.    On August 19, 2010, Defendant PERRIN was again involved in a Use of Force incident and Defendant PBSO was again notified. The reviewing supervisor for Defendant PBSO again determined that Defendant PERRIN should continue to be monitored.

160.    On October 26, 2010, and November 26, 2010 Defendant PBSO was yet again notified that Defendant PERRIN had been involved in two more Use of Force incidents on. The reviewing supervisor for Defendant PBSO still took no further action other than determining that Defendant PERRIN should be monitored.

161.    Specifically on December 2, 2011, Defendant PERRIN was involved in a use of force during a DUI arrest in which a handcuffed and fully-compliant arrestee was forcibly assaulted, thrown to the ground, tasered repeatedly, and struck with fists, knees, feet, and a flashlight. Defendant PERRIN specifically was determined to have struck the handcuffed arrestee in the head with a flashlight which cracked the arrestee's head open requiring staples and emergency care. Initial internal affairs investigations into Defendant PERRIN and the other deputies of Defendant PBSO determined that the officers' actions were justified and no policy

violations occurred. The arrestee filed a federal lawsuit naming Defendant PBSO and Defendant PERRIN as defendants. That lawsuit was resolved out of court.

162.    Additionally, Defendant PERRIN has received dozens of citizen complaints regarding his failure to properly respond to calls, use of inappropriate and abusive language, use of excessive force during arrests, and inability to provide any meaningful assistance upon his arrival on scene.  Despite these repeated complaints, Defendant PBSO failed to take any action against Defendant PERRIN to discipline, train, or otherwise correct this improper conduct.

163.    Each investigation into Defendant PERRIN's misconduct was authorized by Defendant PBSO, through its chief policy maker Sheriff Bradshaw.

164.    Defendant PBSO was on notice at the time of this incident of Defendant PERRIN's history of internal affairs complaints.

165.    Despite multiple documented complaints of excessive force, abuse of authority, neglect of duty, unprofessional conduct, and failure to adequately perform the duties of a sworn law enforcement officer, Defendant PBSO has made no effort to discipline or otherwise correct Defendant PERRIN, due to the custom, practice, and policy of failing to discipline officers following misconduct and using unnecessary excessive force during arrests.

166.    Despite Defendant PBSO being on notice of the problems with Defendant PERRIN's fitness as a deputy, it failed to properly investigate said allegations of misconduct and failed to take any corrective action.

167.    Defendant PERRIN's past employment history demonstrates a proclivity of endangering the general public and individuals he arrests as well as a complete disregard for the duties and responsibilities of a sworn law enforcement officer. In the instant matter, those same

tendencies resulted in the excessive use of force utilized against Plaintiff and the false and misleading statements made by PERRIN in his police reports.

168.   As such, Defendant PBSO negligently retained as a Certified Sworn Law Enforcement Officer Defendant PERRIN, for his illegal and unlawful actions prior to this incident.

### *Defendant PBSO Negligent Retention As To Defendant CERCY*

169.   At all times relevant and material hereto, Defendant CERCY was employed by Defendant PBSO as a Certified Sworn Law Enforcement Officer.

170.   Defendant PBSO was aware, or should have become aware, of problems with Defendant CERCY that indicated his unfitness for duty as a Certified Sworn Law Enforcement Officer.

171.   Defendant CERCY has received dozens of citizen complaints regarding his failure to properly respond to calls, use of inappropriate and abusive language, use of excessive force during arrests, and inability to provide any meaningful assistance upon his arrival on scene. Despite these repeated complaints, Defendant PBSO failed to take any action against Defendant CERCY to discipline, train, or otherwise correct this improper conduct.

172.   Each investigation into Defendant CERCY's misconduct was authorized by Defendant PBSO, through its chief policy maker Sheriff Bradshaw.

173.   Defendant PBSO was on notice at the time of this incident of Defendant CERCY's history of internal affairs complaints.

174.   Despite multiple documented complaints of excessive force, abuse of authority, neglect of duty, unprofessional conduct, and failure to adequately perform the duties of a sworn law enforcement officer, Defendant PBSO has made no effort to discipline or otherwise correct

Defendant CERCY, due to the custom, practice, and policy of failing to discipline officers following misconduct and using unnecessary excessive force during arrests.

175.    Despite Defendant PBSO being on notice of the problems with Defendant CERCY's fitness as a deputy, it failed to properly investigate said allegations of misconduct and failed to take any corrective action.

176.    Defendant CERCY's past employment history demonstrates a proclivity of endangering the general public and individuals he arrests as well as a complete disregard for the duties and responsibilities of a sworn law enforcement officer. In the instant matter, those same tendencies resulted in the excessive use of force utilized against Plaintiff and the false and misleading statements made by CERCY in his police reports.

177.    As such, Defendant PBSO negligently retained as a Certified Sworn Law Enforcement Officer Defendant CERCY, for his illegal and unlawful actions prior to this incident.

### Defendant PBSO Negligent Retention As To Defendant STEPHAN

178.    At all times relevant and material hereto, Defendant STEPHAN was employed by Defendant PBSO as a Certified Sworn Law Enforcement Officer.

179.    Defendant PBSO was aware, or should have become aware, of problems with Defendant STEPHAN that indicated his unfitness for duty as a Certified Sworn Law Enforcement Officer.

180.    Defendant STEPHAN has received dozens of citizen complaints regarding his failure to properly respond to calls, use of inappropriate and abusive language, use of excessive force during arrests, and inability to provide any meaningful assistance upon his arrival on scene. Despite these repeated complaints, Defendant PBSO failed to take any action against Defendant STEPHAN to discipline, train, or otherwise correct this improper conduct.

181.   Each investigation into Defendant STEPHAN's misconduct was authorized by Defendant PBSO, through its chief policy maker Sheriff Bradshaw.

182.   Defendant PBSO was on notice at the time of this incident of Defendant STEPHAN's history of internal affairs complaints.

183.   Despite multiple documented complaints of excessive force, abuse of authority, neglect of duty, unprofessional conduct, and failure to adequately perform the duties of a sworn law enforcement officer, Defendant PBSO has made no effort to discipline or otherwise correct Defendant STEPHAN, due to the custom, practice, and policy of failing to discipline officers following misconduct and using unnecessary excessive force during arrests.

184.   Despite Defendant PBSO being on notice of the problems with Defendant STEPHAN's fitness as a deputy, it failed to properly investigate said allegations of misconduct and failed to take any corrective action.

185.   Defendant STEPHAN's past employment history demonstrates a proclivity of endangering the general public and individuals he arrests as well as a complete disregard for the duties and responsibilities of a sworn law enforcement officer. In the instant matter, those same tendencies resulted in the excessive use of force utilized against Plaintiff and the false and misleading statements made by STEPHAN in his police reports.

186.   As such, Defendant PBSO negligently retained as a Certified Sworn Law Enforcement Officer Defendant STEPHAN, for his illegal and unlawful actions prior to this incident.

187.   As a direct and proximate result of-the-conduct described above, Plaintiffs suffered serious bodily injury and resulting pain and suffering, disability, disfigurement, mental anguish, expense of medical care and treatment.  These losses are either permanent or continuing

and Plaintiffs will suffer the losses in the future, in violation of Plaintiffs' civil rights.  Plaintiffs

have also agreed to pay the undersigned a reasonable attorney fee for his services herein.

WHEREFORE, Plaintiffs pray for the following relief:

a.      Judgment for compensatory damages;

b.      Judgment for exemplary or punitive damages;

c.      Cost of suit;

d.      Reasonable attorney's fees;

e.      Trial by jury as to all issues so triable; and

f.      Such other relief as this Honorable Court may deem just and appropriate.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff CONBOY prays that the Court:

(a)     Declare that Defendants' acts and conduct constituted violations of the Fourth and Fourteenth Amendments of the U.S. Constitution under 42 U.S.C. §§ 1983.

(b)     Judgment in Plaintiff's favor as to all claims for relief.

(c)     Award compensatory damages for the injuries SHAWN CONBOY sustained due to Defendants' conduct for all economic and non-economic damages for medical costs, pain, suffering, humiliation and emotional distress.

(d)     Award punitive and exemplary damages, pre-judgment interest, post-judgment interest, costs, and other reasonable expenses incurred in maintaining this action, and the reasonable attorney's fees and costs incurred in maintaining this action.

(e)     All other relief in law or equity to which Plaintiff is entitled and that the Court deems equitable, just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff hereby demands a trial by jury on all issues within this Complaint.

Respectfully submitted this 2ND day of November, 2015.

**KAPLAN SCONZO & PARKER, P.A.**
PGA Financial Plaza
3399 PGA Boulevard, Suite 150
Palm Beach Gardens, Florida 33410
Telephone: (561) 296-7900
Facsimile:  (561) 296-7919

By: **<u>/S/ Stuart N. Kaplan</u>**
STUART N. KAPLAN, ESQUIRE
Florida Bar No.: 0647934
**skaplan@ksplaw.com**
JOSEPH G. SCONZO, ESQUIRE
Florida Bar No.: 0508720
**jsconzo@ksplaw.com**
Secondary Email: **jwise@ksplaw.com**

ATTORNEYS FOR PLAINTIFF